UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

JEFFREY L. DINSMORE,
PLAINTIFF

VS.

COMMISSIONER OF SOCIAL
SECURITY,
DEFENDANT

CASE NO. 1:08CV422
(SPIEGEL, Sr. J.)
(HOGAN, M. J.)

## REPORT AND RECOMMENDATION

Plaintiff filed his application for disability insurance benefits in January, 2003. His application was denied, both initially and upon reconsideration. Plaintiff then requested and obtained hearings before an Administrative Law Judge (ALJ) in October and December, 2005 at Cincinnati, Ohio. Plaintiff, who was represented by counsel at the hearings, testified as did vocational expert (VE), Dr. George Parsons, and medical expert (ME), Dr. Mary Buban. The ALJ reached an unfavorable decision in February, 2006. Plaintiff then processed an appeal to the Appeals Council, which denied review in April, 2008. Plaintiff then timely filed his Complaint seeking judicial review of the final decision of the Social Security Administration.

## STATEMENT OF ERRORS

Plaintiff asserts that the ALJ erred to his prejudice by basing his residual functional capacity assessment on the opinions of an examining psychiatrist and a record-reviewing psychologist, rather than the opinion of a treating psychiatrist. Plaintiff also finds fault with the ALJ's finding that the jobs identified by Dr. Parsons were consistent with the Dictionary of Occupational Titles in the absence of any testimony to that effect or judicial notice.

## PLAINTIFF'S TESTIMONY AT THE HEARING

Plaintiff testified that he was a single person, living with and being supported by an aged

mother in a private home on Jessup Rd., although subsequent testimony revealed that he was residing "part time" with his girl friend, more appropriately called his lady friend. He is left-handed, 5'8" tall, weighs 198 lbs. and is a high school graduate with one year of college at a business school. He has several convictions for minor drug-related charges, none of which resulted in any jail time. He began service with the Navy in late 1986, but was discharged for medical reasons after 7 months. Plaintiff alleged an onset date of July 10, 2002, and has held a variety of jobs as a delivery person, restaurant worker, stock person, bartender, cook, automotive body work technician. Since his alleged onset date, Plaintiff has worked part-time painting and doing yard work. He admitted "doing better" since his onset date.

Plaintiff testified that he takes Symbyax, which causes drowsiness, and experiences "slight tremors, headaches and nausea." He testified that he frequently takes Tylenol and Pepto-Bismol and vomits approximately once per week. He sees caseworker Aimee Walker and Dr. Fallat, a psychiatrist, at Core Behavioral Health.

When asked why he was unable to work, Plaintiff replied that "his arms go numb" after repetitive labor. He experiences neck pain 4-5 days per month and the neck pain plus fatigue result in temper flare-ups. He also mentioned the nausea, headaches and vomiting spells previously described. Plaintiff stated that his anxiety results in bad decisions with regard to his interpersonal relationships at work. He cited an example when he was short-changed after delivering a pizza, an incident which led to charges of criminal damaging as a result of Plaintiff's breaking the customer's door and throwing pizza sauce on the carpet.

Plaintiff testified that he is able to shop, mow a 1/4 acre lot with a self-propelled mower, read, watch television, listen to music, play the trumpet and plan and cook a meal. He voluntarily stopped driving as a result of two accidents, neither of which was his fault.

Plaintiff testified that he could sit for 45 minutes, stand for 15 minutes and walk approximately 1 mile. He estimated that he could lift 20 lbs. He attributed the numbness he experiences in his hands and arms to a "pinched nerve" in his neck, which resulted from one of the automobile accidents. He is able to bend from the waist, stoop and squat. He has difficulty tolerating stress, difficulty with interpersonal relationships and difficulty placing trust in doctors because of an unfortunate experience with a staph infection. He engages in "aromatherapy" and

2

has seen Dr. Aaron Schrickel, a chiropractor. Lying down helps the neck pain. (Tr., Pgs. 478-515)

When questioned by his lawyer with reference to an "unusual bouquet" about him, Plaintiff expressed a fear of frequent bathing because of the chlorine, arsenic and copper in the water supply. He expressed a belief in the immune power of peppermint. Plaintiff was also asked to explain his caseworker's opinion that he was able to work, but only for a short term. Plaintiff responded that he "goes through manic and depressive phases" (Tr., Pgs. 524 -531).

## THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTION

The first hypothetical question put to the VE asked him to assume Plaintiff was diagnosed with a bipolar disorder and a mild cervical strain. He has the ability to sit for 6-8 hours in a workday, stand/walk 6-8 hours, lift and carry 50 lbs. occasionally and 25 lbs. frequently and occasionally work above shoulder level. The VE responded that Plaintiff could perform all of his past relevant work.

The second hypothetical question, which ultimately formed the basis for the ALJ's residual functional capacity (RFC) findings, asked the VE to assume all the restrictions of the first, plus the added restrictions of a minimally limited ability to understand and remember short and simple instructions, a mild to moderate difficulty understanding, remembering and carrying out detailed instructions, and a mildly to moderately limited ability to interact appropriately with the public, supervisors and coworkers. In addition, Plaintiff would have a mild to moderately limited ability to respond appropriately to work pressure and a mildly limited ability to respond appropriately to changes in routine. Further restriction were that Plaintiff should have limited dealing with the public, no close supervision or teamwork and the job must involve independent tasks. Dr. Parsons responded that Plaintiff could not perform his past relevant work, but for the stocking job, and that he could perform jobs in janitorial service, grounds maintenance and vehicle cleaning, all of which are unskilled and light in exertional level and exist in representative numbers in the national economy. The stocking jobs also exist in representative numbers at the sedentary exertional level.

The third hypothetical asked the VE to assume all the limitations of the first hypothetical

3

and to add the limitations imposed by Dr. Fallot: a fair ability to follow work rules, relate to coworkers, deal with the public, use judgment, deal with work stress, maintain attention and concentration, behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability. In addition, Plaintiff has a good ability to function independently, persist at work-like tasks, understand, remember and carry out complex instructions, maintain personal appearance and a poor ability to interact with supervisors and understand, remember and carry out detailed (but not complex) instructions. Plaintiff would have a moderate limitation of his ability to perform the activities of daily living, maintaining social functioning, maintaining concentration, persistence or pace and would experience one or two episodes of decompensation. Dr. Parsons responded that Plaintiff could perform the jobs enumerated in his response to the second hypothetical question.

The fourth hypothetical was based on the assumption that the ALJ found Plaintiff's testimony fully credible. Dr. Parsons responded that Plaintiff "would have difficulty performing any work activity."

## THE MEDICAL EXPERT

Dr. Buban, a clinical psychologist, reviewed the medical evidence in Plaintiff's file and indicated that she had sufficient records to "reach a conclusion regarding his medical requirements." Dr. Buban stated that Plaintiff had a history of drinking and marijuana use. She indicated that Dr. Eggerman evaluated Plaintiff and diagnosed him as having "bipolar affective disorder with partial remission." She assigned a GAF of 55 and found Plaintiff's primary symptom to be a mood disorder. She said Plaintiff's medical records showed noncompliance with medication and symptom aggravation by marijuana use. A prior psychiatric evaluation showed moderate impairment of his ability to perform activities of daily living, maintain social function, maintain concentration, persistence or pace. He experienced one or two episodes of decompensation. On another form, Plaintiff was rated as having a fair ability to follow work rules, relate to coworkers, deal with the public and use judgment. His ability to work independently was good, but his ability to deal with work stresses was rated as fair. His ability to relate to supervisors was rated as poor. His ability to concentrate was fair, but his ability to

persist was rated as good. His ability to maintain personal appearance was rated as good, but his ability to behave in an emotionally stable manner was rated as fair as was his ability to relate predictably in social situations and demonstrate reliability.

Dr. Buban's opinion was that Plaintiff should be limited in dealing with the public, teamwork and close supervision. Dr. Buban accepted the caseworker's opinion that Plaintiff had the ability to be employed, but only for a "short term." She testified that she did not know what the caseworker and or Dr. Fallat meant by the phrase "short term" in relation to plaintiff's ability to perform substantial gainful activity.

## THE DECISION OF THE ADMINISTRATIVE LAW JUDGE

The ALJ found that Plaintiff has several severe impairments: mild cervical strain, multi-level cervical disc bulging, resulting in severe back and neck pain and headaches. Plaintiff also has a severe bipolar disorder, an obsessive compulsive disorder, and a history of polysubstance dependence. The ALJ found that none of Plaintiff's impairments, alone or in combination, were of Listing level. The ALJ found that Plaintiff had the residual functional capacity to perform a limited range of medium work and was therefore not disabled.

## THE MEDICAL RECORD

One might say that a glimpse into Plaintiff's credibility can be obtained from reading some of his answers to standard questions on Social Security forms. For example, on a form requesting additional information about him or his disability claim, Plaintiff remarked that "SSI sucks." (Tr., Pg. 109). On another form where he was asked to describe his limitations, Plaintiff responded with these comments: "I'm one who can tell when a woman is on the rag just by smelling them and it isn't pleasant," and "Most women suck, I even have fantasies about ringing their necks." (Tr., Pg. 132). On yet another form, Plaintiff was asked to indicate the changes in his daily activities since he filed his claim. He responded with: "Dr. Jeffrey Wonder can suck a big _____ " and "signed your little Unibomber II in progress." (Tr., Pg. 134).

Records from Core Behavioral Health indicate that Plaintiff suffers from "mood swings," that he was discharged from the Navy after a "psychotic episode" and subsequently treated by Dr.

5

W. Rufus Smith, who felt that Plaintiff could profit from vocational services and day treatment programs. He was hospitalized for approximately 6 months after that episode, during which time he was put on Lithium and responded positively. Both his father and a sister were diagnosed with bipolar disorder. Plaintiff drinks in order to self-medicate and has used marijuana since he was 12 years of age. His memory and intellectual functioning were normal, but he has poor judgment and needs constant redirection. Plaintiff was diagnosed with bipolar disorder and cannabis dependence. He was assigned a GAF of 51. (Tr., Pgs. 144-162). Plaintiff was put on a drug regimen of Lithobid, Depakote, Cogentin and Trilofor. (Tr., Pg. 166). In May, 2003, it was reported that "Patient has ongoing substance abuse." and was advised not to take alcohol or illicit substances with medications. (Tr., Pgs. 169-170).

Treatment notes from Drs. Savignano and Spears, Chiropractors, were from the period from August, 2001 to January, 2003. The stimulus for chiropractic treatment was an automobile accident and the upper back and neck pain which resulted. He was treated with stretching exercises, traction, ice and chiropractic manipulations. Swimming and walking were encouraged. He was discharged feeling better, but still experiencing some degree of pain. Stretching was emphasized as was the need to continue stretching exercises. (Tr. Pgs 173-199).

In May, 2002, a treatment note from Core Behavioral Health indicated that Plaintiff had abused substances since his last visit. Sobriety compliance was encouraged. (Tr., Pg. 203). In November, 2002, Plaintiff reported "occasional alcohol use" to Core Behavioral Health. (Tr., Pg. 208). Plaintiff had a history of missed appointments. (Tr., Pg. 213). Another treatment note indicated that Plaintiff continued to use marijuana and alcohol. (Tr., Pg. 214). So did an additional treatment note. (Tr., Pg. 218).

Plaintiff began seeing Dr. Aaron Schrickel at the Back and Spine Center of West Chester following his automobile accident in February, 2002. Treatment began in February, 2003. The symptoms were neck and low back pain and stiffness as well as headaches. Treatment consisted of heat, mechanical traction, electric muscle stimulation, therapeutic exercise, stretching and chiropractic manipulations. At the conclusion of treatment in July, 2003, range of motion and pain levels had improved. (Tr., Pgs. 221-330).

An MRI of the cervical spine, performed in February, 2003, showed a "disc protrusion at

C2-3 on the left" and a "small right paracentral end plate osteophyte with a 1-2 mm right paracentral associated disc protrusion at C5-6." (Tr., Pgs. 254 &391).

A psychiatric evaluation was done in April, 2003 by Kevin Eggerman, M.D., a psychiatrist. Plaintiff related to Dr. Eggerman that his longest continuous employment was a period of 11 months as a driver and pizza maker for Domino's Pizza. and that he had been hospitalized twice for psychiatric problems. He also related a history of marijuana abuse and noncompliance with treatment. He also told Dr. Eggerman that he is a high school graduate who attended regular classes. Dr. Eggerman observed that Plaintiff's "thought processes are logical, coherent and goal directed." His "concentration is fair; mild to moderate distractibility is observed. Thought content reveals some residual psychotic symptomology or ideation." Dr. Eggerman observed "mild anxiety." The diagnosis was "bipolar affective disorder in partial remission." A GAF of 55 was assigned. Dr. Eggerman found minimal limitations of Plaintiff's ability to understand, remember and carry out short and simple instructions, and make judgments on simple work-related decisions, but a moderate limitation of Plaintiff's ability to understand, remember and carry out detailed instructions. Dr. Eggerman found a mild limitation of Plaintiff's ability to respond appropriately to changes in routine, but a mild to moderate limitation of his ability to interact appropriately with the public, supervisors and coworkers and to respond appropriately to work pressures. (Tr., Pgs. 330-335).

Plaintiff was evaluated in April, 2003 by Jeffrey Wunder, M.D., whose specialty is physical medicine. Dr. Wunder was told that Plaintiff's complaints were "limited mobility in the neck" and "shooting pain in the left leg." Plaintiff had two previous automobile accidents, one in August, 2001 and the other in March, 2002. The first accident or both of them resulted in a cervical strain and low back pain, for which Plaintiff was treated by a chiropractor and prescribed muscle relaxants. He used a TENS unit. Dr. Wunder diagnosed Plaintiff with a "mild cervical strain." Dr. Wunder placed a lifting restriction of 50 lbs., occasionally, and 25 lbs., frequently, and restricted Plaintiff from frequent work above shoulder level. (Tr., Pgs. 336-339). Muscle testing was normal as were range of motion studies with the exception of slight deviations with regard to cervical extension and shoulder abduction. (Tr., Pgs. 340-343).

Robert Gaffey, Ph.D., completed a Mental Residual Functional Capacity Assessment in

7

May, 2003. Dr. Gaffey found no significant limitations in any category of understanding and memory, sustained concentration and persistence and adaptation, with the sole exception of Plaintiff's ability to complete a normal workweek without interruptions from psychologically-based symptoms, which he found was moderately limited. In the category of social interaction, all subcategories were moderately limited, except Plaintiff's ability to ask simple questions or ask assistance, which was not significantly limited. Dr. Gaffey's diagnosis was bipolar disorder in partial remission. Dr. Gaffey rated Plaintiff's restriction of the ability to perform activities of daily living as "mild" and his difficulty maintaining social function and maintaining concentration, persistence or pace as "moderate." He would not and has not experienced any repeated episodes of decompensation. J. Rod Coffman, Ph.D., agreed. (Tr., Pgs. 349-363).

David Fallat, M.D., and Aimee Walker, counselor, at Core Behavioral Health, completed a Medical Assessment of Ability to do Work-Related Activities. Plaintiff's ability to interact with supervisors was rated as "poor," while his ability to function independently and persist at a work-like task were rated as "good." Plaintiff had a "fair" ability to follow work rules, interact with coworkers, supervisors and the public, use judgment, deal with work stresses and maintain attention and concentration. Plaintiff's ability to understand, remember and carry out both simple and complex instructions was rated as "good," but his ability to understand, remember and carry out detailed instructions was rated as "poor." Dr. Fallat and Ms. Walker rated Plaintiff's ability to maintain personal appearance as "good," but his ability to behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability as "fair." Dr. Fallat's and Ms. Walker's opinion was that "Plaintiff may have the ability to be employed, but for a short time." They base their opinion on the fact that Plaintiff suffers from mood swings, has inflated sense of self-esteem and has been excessively involved in negative activities. "His grandiose attitude, memory loss and manic episodes cause client to be distracted, rude and unreliable." They agree that Plaintiff suffers from bipolar disorder. Their restriction regarding activities of daily living was rated as "moderate," as was his difficulty maintaining social functioning and maintaining concentration, persistence or pace. He would experience one or two episodes of decompensation. (Tr., Pgs. 399-412).

In February, 1990, Plaintiff indicated that he used marijuana 3-4 times per week and

drank 3-4 beers to "balance his mood out." (Tr., Pg. 413).

Plaintiff had surgery at University Hospital in April, 2005 after being the victim of an assault. Plaintiff suffered a broken right condyle and left mandible. An impacted tooth was also removed. Likith Reddy, D.D.S., M.D. was the surgeon. Hospital reports show that Plaintiff was bipolar and had a history of marijuana addiction. (Tr., Pgs. 438-454).

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for disability insurance benefits, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. §§ 416(i), 423. Establishment of a disability is contingent upon two findings. First, plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 416.920. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a

9

severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 416.920(d). Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

The Commissioner is required to consider plaintiff's impairments in light of the Listing of Impairments. 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing). The Listing sets forth certain impairments which are presumed to be of sufficient severity to prevent the performance of work. 20 C.F.R. § 416.925(a). If plaintiff suffers from an impairment which meets or equals one set forth in the Listing, the Commissioner renders a finding of disability without consideration of plaintiff's age, education, and work experience. 20 C.F.R. § 416.920(d); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

Plaintiff's impairment need not precisely meet the criteria of the Listing in order to obtain benefits. If plaintiff's impairment or combination of impairments is medically equivalent to one in the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 416.920(d). To determine medical equivalence, the Commissioner compares the symptoms, signs, and laboratory findings concerning the alleged impairment with the medical criteria of the listed impairment. 20 C.F.R. § 416.926(a). The decision is based solely on the medical evidence, which must be supported by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 416.926(b).

If plaintiff's alleged impairment is not listed, the Commissioner will decide medical equivalence based on the listed impairment that is most similar to the alleged impairment. 20

C.F.R. § 416.926(a). If plaintiff has more than one impairment, and none of them meet or equal a listed impairment, the Commissioner will determine whether the combination of impairments is medically equivalent to any listed impairment. *Id.*

Plaintiff has the burden of establishing disability by a preponderance of the evidence. *Born v. Secretary of Health and Human Servs.*, 923 F.2d 1168, 1173 (6th Cir. 1990); *Bloch v. Richardson*, 438 F.2d 1181 (6th Cir. 1971). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999); *Born*, 923 F.2d at 1173; *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321, 323 (6th Cir. 1978). *See also Richardson v. Secretary of Health & Human Services*, 735 F.2d 962, 964 (6th Cir. 1984)(per curiam). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *O'Banner*, 587 F.2d at 323. *See also Cole v. Secretary of Health and Human Services*, 820 F.2d 768, 771 (6th Cir. 1987).

It is well established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) (same); *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048, 1054 (6th Cir. 1983) (same). Likewise, a treating physician's opinion is entitled to weight substantially greater than that of a non-examining medical advisor. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048, 1054 (6th Cir. 1983). If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is

11

well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. § 416.927(d)(2); *see also Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004); *Walters*, 127 F.3d at 530. "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

The Social Security regulations likewise recognize the importance of longevity of treatment, providing that treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 416.927(d)(2). In weighing the various opinions and medical evidence, the ALJ must consider other pertinent factors such as the length, nature and extent of the treatment relationship, the frequency of examination, the medical specialty of the treating physician, the opinion's supportability by evidence and its consistency with the record as a whole. 20 C.F.R. § 416.927(d)(2)-(6); *Wilson*, 378 F.3d at 544. In terms of a physician's area of specialization, the ALJ must generally give "more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 416.927(d)(5).

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 111 S. Ct. 2157, 2163 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.*, 892 F.2d 1043

(Table), 1990 WL 94 (C.A.6 (Mich.)). Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Remand ordered after a hearing on the merits and in connection with an entry of judgment does not require a finding that the Commissioner had good cause for failure to present evidence at the prior administrative hearing. *Faucher*, 17 F.3d at 173.

## OPINION

In his first Statement of Error Plaintiff argues that the ALJ violated what is known as the "treating physician rule," because she adopted the conclusions of two-non-treating sources, one of whom conducted an examination and the other of whom was merely a record reviewer. The ALJ concluded that the opinions of Dr. Eggerman are entitled to more weight than that of Plaintiff's treating physician because they are "well supported by the overall objective evidence." The ALJ also concluded that Dr. Fallat's opinion, was too restrictive and was not well supported by objective evidence. The ALJ also considered Dr. Fallat's opinion that Plaintiff had a poor ability to carry out detailed instructions, but a good ability to carry out complex instructions to be unclear and confusing. The ALJ also concluded that Dr. Fallat's opinion that Plaintiff demonstrated, on the one hand, "one or two" episodes of decompensation, (See Tr., Pg. 409) and on the other hand, "repeated episodes of decompensation." to be inconsistent. (See Tr., Pg. 410).

> Social Security Ruling 96-2p provides in relevant part:
>
> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' *not that the opinion should be rejected.* Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. *In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.* (emphasis added).

In evaluating the ALJ's reasons adopting the opinion of Dr. Eggerman, the Court finds

13

that the ALJ's use of the phrase "well supported by the overall objective evidence" to be simple reliance upon boilerplate language. The real issue in this case as evidenced by the opinions of plaintiff's treating sources and the testimony of the ALJ's Medical Expert centers not on whether Plaintiff is physically capable of work activity, but how long Plaintiff could sustain a job if he were to find gainful employment. Dr. Eggerman was never asked his opinion on Plaintiff's employability, but he found no marked or extreme limitations in any category affecting one's capacity to work, so the inference is that Dr. Eggerman felt that Plaintiff could sustain full-time employment. Dr. Buban, the Medical Expert, was asked whether Plaintiff could sustain a 40-hours-per week job. Her answer was "probably not" if the case manager's comment about Plaintiff being frequently tardy was true. She also indicated that she did not know what Dr. Fallat meant by his comment that plaintiff could engage in work activity but only "for a short time." Dr. Fallat, on the other hand, opined that Plaintiff met Listing 12.04, and if he is right, Plaintiff is presumed unable to sustain full-time work.

Dr. Fallat is a treating psychiatrist at Core Behavioral Health, a division of Talbert House. Dr. Fallat noted that Plaintiff met the depressive syndrome component of the manic depressive disorder by exhibiting an appetite disturbance with a change of weight, a sleep disturbance and difficulty concentrating. Dr. Fallat felt that Plaintiff met the manic syndrome criteria by exhibiting hyperactivity, flight of ideas, inflated self-esteem, easy distractability and involvement in activities that have a high probability of painful consequences. Dr. Fallat had a three-year treatment relationship with his patient, prescribed his medications, and worked with his counselor, Aimee Walker. Dr. Fallat had significantly more contact as a treating physician than did either Dr. Eggerman, who examined Plaintiff, but did not treat him, or Drs. Gaffey, Coffman or Buban, who never saw Plaintiff.

Drs. Gaffey and Coffman, paper reviewers, agreed that Plaintiff was a manic-depressive, but found no marked limitation in any category of work-related ability.

Let's discuss for the moment whether Dr. Fallat's conclusion that Plaintiff had a poor ability to interact with superiors was "too restrictive" as the ALJ claimed. Dr. Eggerman found a mild to moderate limitation of Plaintiff's ability to interact appropriately with supervisors. Drs. Gafey/Coffman found that Plaintiff's ability to respond appropriately to criticism from superiors

14

was moderately limited. In the narrative section of his report, Dr. Gaffey indicated that Plaintiff "can deal with supervisors and work relationships that are superficial or infrequent." Plaintiff's employment history shows that he has had many jobs of unusually short duration and his own testimony was that he has made many bad decisions in terms of his personal relationships at work. Plaintiff's service record reflected the same trend. Plaintiff's tendency to behave in inappropriate ways can be judged from his nonresponsive and grossly inappropriate answers to simple questions on his application-for-benefits forms. Dr. Fallat indicated that Plaintiff has an inflated view of himself and that he is rude and unreliable. In light of all the evidence, one could say that Dr. Fallat's opinion that Plaintiff had a poor ability to interact with superiors was better supported than any opposing view.

At the hearing, the ALJ questions Dr. Buban about Dr. Fallat's conclusion that Plaintiff could be employed for "short periods of time." Dr. Buban testifies that she des not know whether Dr. Fallat is referring to employment wherein plaintiff needs to take several breaks daily in the course of his 40 hour work week, or short periods of employment, such as seasonal or summer employment. (Tr. 519). Rather than pursue this line of inquiry, the ALJ ignored the issue. It seems obvious to the undersigned that Dr. Fallat was referring to plaintiff's inability to remain employed once he had secured a job. Dr. Fallat's report indicates that Plaintiff's psychiatric symptoms such as mood swings, grandiose attitude, inflated self-esteem and tendency to become involved in negative activities, and unreliability would, in a relatively short period of time, result in a separation from employment because of social inadequacies, not physical problems. What that period of time might be is an issue that must be addressed to determine whether plaintiff can engage in substantial gainful activity. The ALJ's failure to do so constitutes error.

The issue of whether Plaintiff is able to obtain and keep a job without rotating through successive jobs is important because it bears on the ultimate question of whether Plaintiff has the residual functional capacity to engage in substantial gainful activity.

> A finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a determination that the claimant can

15

hold whatever job he finds for a significant period of time.

*Singletary v. Bowen*, 798 F.2d 818, 822 (5th Cir. 1986)(emphasis in original). *Accord Wallace v. Barnhart*, 256 F. Supp.2d 1360, 1376 (S.D. Fla.2003); *Gatliff v. Comm'r*, 172 F.3d 690, 694 (9th Cir. 1999); *Parish v. Califano*, 642 F.2d 188, 192-93 (6th Cir. 1981). Courts are reticent to establish any bright line rules governing what constitutes "a significant period of time;" however, it is generally acknowledged that a claimant who cannot hold a job for more than two or three months at a time is not able to engage in substantial gainful employment. *See Wallace*, 256 F. Supp. at 1377, n.8; *Gatliff*, 172 F.3d at 693, n.3 & 694.

Courts have reached this conclusion in part, based on the Social Security Administration's own rules governing what constitutes evidence of substantial gainful activity. The Social Security Administration generally considers a work effort lasting three months or less because of the claimant's impairments to be an unsuccessful work attempt, and therefore does not constitute evidence of an ability to engage in substantial gainful activity. *See* 20 C.F.R. §§ 404.1574(a)(1), 406.974 (a)(1) (2003); SSR 84-25.

As the *Wallace* Court noted:

Unlike a physical impairment, it is extremely difficult to predict the course of mental illness. Symptom-free intervals, though sometimes indicative of a remission in the mental disorder, are generally of uncertain duration and marked by an impending possibility of relapse. Realistically, a person with a mental impairment may be unable to engage in competitive employment, as his ability to work may be sporadically interrupted by unforeseeable mental setbacks.

256 F. Supp.2d at 1376.

In this case, plaintiff's self-reported work history indicates that he has had approximately nine jobs from 1987 through 2002. (Tr. 103, 124). These jobs have lasted anywhere from four weeks, to six months to in excess of two years. However, it appears that the more recent the job, the shorter the duration of employment. I addition, plaintiff's treating physician has indicated that he could only work "for a short time," and the medical expert has testified that the treating physician's comments may indicate an issue with maintaining and sustaining gainful employment. (TR. 519). Under these circumstances, the ALJ must determine not just whether plaintiff's impairments render him physically and mentally capable of getting a job, but whether

he can actually sustain it long enough to constitute substantial gainful activity.

The Second Statement of Errors faults the ALJ for her finding that the number of jobs located by the VE, Dr. Parsons, was consistent with the Dictionary of Occupational Titles, in the absence of testimony or a stipulation supporting that finding. Defendant's Memorandum in Opposition concedes that a direct question was not asked, nor was a response given, which indicated that all the numbers cited by Dr. Parsons were consistent with the Dictionary of Occupational titles, but Defendant also points out that Dr. Parsons was asked to supply "representative DOT numbers" and he did so. We find, in the absence of cross-examination concessions or other opposing direct evidence, that the ALJ was justified in concluding that the numbers cited by Dr. Parsons were consistent with the Dictionary of Occupational titles.

## CONCLUSION

After a full and complete review of the briefs and the entire Administrative Record, including Plaintiff's medical record, we find that the ALJ's decision was not substantially supported and should be reversed and remanded pursuant to Sentence Four of 42 U.S.C. § 405(g) for further consideration of whether plaintiff retains the residual functional capacity to engage in significant gainful activity for a substantial period of time sufficient to support a conclusion that can perform a significant number of jobs in the regional economy and is therefore not disabled under the Act.

_____
Timothy S. Hogan
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

Jeffrey L. Dinsmore,
    Plaintiff

vs.

Commissioner of Social
Security,
    Defendant

Case No. 1:08-cv-422
(Spiegel, Sr. J.)
(Hogan, M. J.)

## NOTICE

Attached hereto is the Report and Recommended Decision of the Honorable Timothy S. Hogan, United States Magistrate Judge, which was filed on 6/17/2009. Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten (10) days after being served with this Report and Recommendation. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation are based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).